```
                                                       U.S. DISTRICT COURT
                                                      DISTRICT OF VERMONT
                                                             FILED
               UNITED STATES DISTRICT COURT
                        FOR THE                       2015 DEC 15  AM 9: 33
                  DISTRICT OF VERMONT
                                                            CLERK
                                                      BY_____
UNITED STATES OF AMERICA       )                         DEPUTY CLERK
                               )
      v.                       )
                               )              Case No. 5:15-cr-68-1
KYLE WOLFE,                    )
                               )
      Defendant.               )
```

**OPINION AND ORDER RE:**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**
**(Doc. 38)**

Kyle Wolfe is charged with conspiracy to distribute heroin in violation of 21 U.S.C. §§ 846, 841(a)(1). Wolfe moves to suppress all evidence and statements obtained after his arrest on April 30, 2015 on the grounds that law enforcement lacked reasonable suspicion to stop the vehicle in which he was traveling, law enforcement lacked probable cause to arrest him, and the search warrant used to obtain evidence from his residence was invalid because it was based in part on observations made during an unlawful security sweep of his apartment. For the following reasons, Wolfe's Motion to Suppress (Doc. 38) is DENIED.

**I.      Background**

The following facts are drawn from the affidavit of Drug Enforcement Administration ("DEA") Special Agent Brandon Hope, the affidavit of DEA Task Force Officer Robert Sylvia, the parties' filings, and the testimony at the suppression hearing held on December 1, 2015.

On April 29, 2015, agents of the DEA Task Force arrested an individual in Burlington, Vermont, as he was in the process of selling heroin. During the search of this individual and his vehicle, the agents seized $2,512 in cash and approximately ten bundles of heroin stamped with a purple design and the words "Take Over."[1] (Doc. 5-1 at 3-4.) As a result of his arrest, this

---

[1] Officer Sylvia's Affidavit explains that a bundle "refers to 10 individual bags of heroin" and a sleeve "is a common term used by heroin distributors to describe a quantity of heroin equal to 10 'bundles.'" (Doc. 5-1 at 3.)

individual became a cooperating source ("the CS") for the Task Force.  The CS had not previously worked as an informant.  While he had no criminal history in Vermont, he admitted to having at least one prior drug felony conviction in another state.

The CS told the agents that he worked as a runner for a heroin ring.  He explained that he had recently driven to New York City with another individual to obtain heroin, remained there for several days, and returned to Vermont that morning with a black male known to him as "Roger."  (*Id.* at 2-3.)  Roger had obtained approximately 25 sleeves of heroin to sell in Vermont, which he kept in his backpack.  Upon their return, the CS brought Roger and the heroin to an apartment on Wright Court in South Burlington, where a white man known to the CS as "Kyle" lived.  (*Id.* at 3.)  The CS reported that Kyle lived in the apartment on the left side of the duplex, which was the most northwestern unit on Wright Court ("the apartment").  The agents determined that the apartment was the residence of a man named Kyle Wolfe.  The CS explained that after dropping Roger off, other members of the ring had instructed the CS to pick up heroin and cash elsewhere in Chittenden County and bring it back to Roger at the apartment.  It was this contraband and money that the agents found on the CS at the time of his arrest.

Thereafter, the CS agreed to execute a controlled payback at the apartment.  The agents searched the CS and his vehicle for drugs, large sums of currency, and other contraband with negative results.  The agents photographed $2,512 of official funds and provided it to the CS to give to Roger.  Officer Sylvia instructed the CS to attempt to identify the people inside the apartment and to confirm whether any weapons were present, as the CS had previously seen Kyle with a pistol and knew him to have an assault rifle.  Officer Sylvia and other agents then followed the CS to the apartment and monitored the transaction through an audio transmitting device.  Once the CS was inside the apartment, Officer Sylvia heard him meet with two different men.  At one point, the CS said "twenty-five twelve" and Officer Sylvia could hear what sounded like money being counted and the mention of a taxi cab.  (*Id.* at 4.)

After the CS left the apartment, he met again with the agents.  He turned over 17 bundles of heroin stamped with the same "Take Over" label and purple design that was on the heroin seized from him earlier in the day.  (*Id.* at 4-5.)  The CS told the agents that he received the heroin from Roger and that he counted out the $2,512 of official funds with Roger.  The CS reported that Kyle was the only other person he saw inside the apartment besides Roger.  Kyle

2

had answered the door and held a black pistol throughout the transaction. Officer Sylvia testified at the suppression hearing that the CS had described this individual to the agents before the controlled payback as being "a larger white male with long, dark hair and some facial hair." After the transaction, the CS confirmed to the agents that this representation still accurately described Kyle.

The agents maintained constant surveillance of the exterior of the apartment before, during, and immediately after the controlled payback. They observed no one except the CS enter or leave the apartment. After the transaction, the agents created a ruse in the hopes of getting Kyle and Roger to leave the apartment. An agent used the CS's cellular telephone to send text messages to a phone number that the CS identified as belonging to Kyle and to numbers belonging to other members of the ring. These texts said that the CS had been stopped by the police and that law enforcement might have seen him leaving the apartment. Twenty minutes later, the agents observed a white male matching the CS's description of Kyle leave the apartment and enter a taxi cab. Shortly thereafter, the agents saw a black male leave the apartment with a backpack.[2]

At the request of the agents, uniformed South Burlington police officers stopped the taxi. The officers drew their weapons and ordered the passenger to exit the taxi, place his hands on his head, walk backwards, and drop to his knees. The passenger complied with all requests. He was then placed in handcuffs, and later identified himself as "Kyle Wolfe." Officer Sylvia noted that Wolfe's appearance matched the CS's description of the man he knew as Kyle. After his arrest, the police searched Wolfe. They seized a cell phone, wallet, key ring, and an empty pistol holster. The police took Wolfe to the South Burlington Police Station.

The agents asked for consent from Wolfe to search his apartment. He declined. While Wolfe was in police custody, the agents used a key they had seized from him to enter the apartment. They performed a "security sweep" and observed ". . . in plain sight the following

---

[2] This individual was subsequently taken into custody. He initially identified himself as "Roger Jackson," but eventually admitted that his true name was Darren Walker. (Doc. 5-1 at 6.) On Walker's person, the agents found a piece of paper with handwritten notations that read "16 sleeves" and "8 buns." (*Id.*) The agents also found cash on Walker, some of which contained serial numbers that matched those on the official funds provided to the CS. Walker is a co-defendant in this case.

items: a pistol, an assault rifle, numerous needles, and numerous bags of what appeared to be used heroin bags." (Doc. 1-3 at 7.) Thereafter, the agents secured the apartment until they obtained a search warrant. A subsequent search pursuant to the warrant yielded considerable evidence of heroin distribution.

## II. Analysis

Wolfe argues that there was neither reasonable suspicion to stop the taxi in which he was traveling nor probable cause for his arrest. He additionally contends that there were no exigent circumstances to justify the security sweep of his apartment. Finally, he submits that the search warrant was invalid because the application included information derived from unlawful law enforcement activity. The Government disagrees, arguing that the initial stop was supported by both reasonable suspicion and probable cause to arrest, the security sweep of the apartment was justified by concerns about officer safety and the potential destruction of evidence, and the search warrant was supported by a valid and sufficient factual basis. Having considered the parties' pre-hearing memoranda and exhibits, and having assessed the testimony and credibility of Officer Sylvia at the December 1, 2015 suppression hearing, the Motion to Suppress is DENIED.

### A. Probable Cause

Though both parties have briefed the issue of whether reasonable suspicion supported the stop of Wolfe's taxi, the court does not view this stop as an investigative stop governed by *Terry v. Ohio*, 392 U.S. 1 (1968). Rather, it is evident from law enforcement's actions after the taxi was pulled over (i.e. drawing guns, using handcuffs) that the stop was undertaken in order to arrest the passenger. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 215 & n.17 (1979) (drawing of guns and handcuffing are two of "the trappings of a technical formal arrest"); *United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir. 1981). Accordingly, the court first considers whether law enforcement had probable cause to arrest the defendant when stopping the taxi.[3]

---

[3] Assessing the precise moment in which Wolfe was in police custody only matters in relation to a statement Wolfe made prior to receiving his *Miranda* rights. As discussed at the suppression hearing, that statement is not the subject of the present motion.

4

"Probable cause exists where the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (internal quotation marks and citation omitted). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). This standard is a "'practical nontechnical conception' that deals with the 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Gates*, 462 U.S. at 231). As this standard "is fluid and contextual, a court must examine the totality of the circumstances of a given arrest" and the circumstances "must be considered from the perspective of a reasonable police officer in light of his training and experience." *Delossantos*, 536 F.3d at 159 (citations omitted). Courts "must consider those facts available to the officer at the time of the arrest and immediately before it." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (citation omitted).

Here, probable cause supported Wolfe's arrest. At the time of his arrest, agents knew or had reasonably trustworthy information as to the following facts: (1) the CS was arrested while selling heroin with distinct markings for a drug ring; (2) earlier that day, the CS had brought Roger who had a large quantity of heroin to an apartment where a man he knew as Kyle, a larger white male with dark hair and facial hair, lived; (3) members of the drug ring directed the CS to go back to the same apartment to deliver cash from drug sales; (4) law enforcement records confirmed that a Kyle Wolfe resided at the apartment in question; (5) the CS participated in a controlled payback of cash at Wolfe's residence while wearing a hidden audio recording and monitoring device; (6) during the controlled payback, Kyle answered the door for the CS, the CS provided the official funds to Roger, the CS obtained heroin from Roger, Kyle monitored the transaction while armed, and law enforcement heard, via the audio device, two males talking with the CS, someone say "twenty-five twelve," (Doc. 5-1 at 4), and the sound of money being counted; (7) after the controlled payback, the CS provided law enforcement with a large quantity of heroin bearing the same distinctive labels that were on the drugs previously seized from him; (8) the CS believed only Kyle and the black male he knew as Roger were in the apartment during the payback; (9) law enforcement sent ruse text messages to a number that the CS said belonged

to Kyle and shortly thereafter law enforcement saw a white male matching the CS's description of Kyle leave the apartment and get into a taxi; and (10) law enforcement had surveilled the apartment since the controlled payback and saw no one, besides the CS, enter or leave the residence until the white male left.

While many of these facts were provided by a confidential informant, "[i]nformation may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence." *United States v. Wagner*, 989 F.2d 69, 72-73 (2d Cir. 1993); *see also United States v. Steppello*, 664 F.3d 359, 365 (2d Cir. 2011) ("no need to show past reliability when the informant is in fact a participant in the very crime at issue"). Here, many of the notable aspects of the CS's account were corroborated in material respects by independent facts. For example, the CS's assertion that he knew a male named Kyle who lived at a particular residence on Wright Court was corroborated by law enforcement records showing that a Kyle Wolfe lived at that address. The CS's assertion that men involved in a drug ring were presently inside Wolfe's residence awaiting the CS's cash delivery was corroborated by audio evidence obtained during a controlled payback and the fact that the CS entered the apartment without drugs and emerged with 17 bundles of heroin. *See Wagner*, 989 F.2d at 73 ("An informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause."). Finally, the CS's claim that a particular telephone number belonged to the man he knew as Kyle, a larger white male with dark hair and facial hair, was corroborated by the fact that surveilling agents saw a man with this appearance exiting the apartment shortly after ruse text messages had been sent to that number. The court concludes that Wolfe's arrest was supported by probable cause to believe he was involved in the sale and distribution of heroin. *See United States v. Davis*, No. 5:12-cr-71, 2014 WL 5305984, at *16 (D. Vt. Oct. 15, 2014); *United States v. Alexander*, 923 F. Supp. 617, 623 (D. Vt. 1996).

### B.  Apartment Sweep

Wolfe also argues that the warrantless sweep of his apartment was unlawful because no exigent circumstances were present at the time. The Government contends that the sweep was necessary to ensure that no one remained inside the apartment that could either endanger law enforcement or destroy evidence while the agents applied for a search warrant.

"Searches within a home without a warrant are presumptively unreasonable in violation of the Fourth Amendment absent exigent circumstances." *Alexander*, 923 F. Supp. at 622 (citations omitted). "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to . . . take action." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc) (citation omitted). Such circumstances exist "when either the evidence sought is in imminent danger of destruction or if the safety of the public or law enforcement is threatened." *United States v. Cromer*, Nos. 2:08-CR-72-1, 2:08-CR-72-2, 2009 WL 1181301, at *2 (D. Vt. Apr. 30, 2009) (citation omitted). Courts must apply an objective test when considering whether a warrantless entry was justified by the presence of exigent circumstances, *see United States v. Zabare*, 871 F.2d 282, 291 (2d Cir. 1989), and the burden of proof is on the Government. *See Alexander*, 923 F. Supp. at 622.

The security sweep exception is most frequently invoked in cases where law enforcement officers have lawfully entered premises to effect an arrest. *See, e.g., United States v. Christophe*, 470 F.2d 865, 867-69 (2d Cir. 1972). The Second Circuit has noted that "[d]ifferent considerations come into play . . . when a defendant is arrested outside his residence and the government seeks to justify an entry into the home for a security check." *United States v. Vasquez*, 638 F.2d 507, 531 (2d Cir. 1980). This is due in part to the fact that an "arresting officer's need for protection from persons in the home will often be less compelling when the arrest takes place outside." *Id.* Accordingly, in instances where a lawful arrest has taken place outside the defendant's residence, officers may conduct a security check inside the premises only if they have "a reasonable belief that third persons are inside" and "a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." *United States v. Agapito*, 620 F.2d 324, 336 n.18 (2d Cir. 1980).

Here, although law enforcement subjectively believed they needed to enter the apartment to conduct a security check, this belief was not objectively reasonable under the circumstances. Both Wolfe and Walker were arrested outside of the apartment making it less likely that their arrests would have been known to anyone remaining in the apartment. *See id.* at 336. The CS reported only seeing two people in the apartment and the agents monitoring the controlled

payback heard him meet with only two people. Officer Sylvia also testified that, while he could not be one hundred percent positive, he thought only two people were inside the apartment during the controlled transaction. Given that law enforcement had established continuous surveillance of the apartment for hours and saw two men leave (and no one enter), it was not objectively reasonable to believe anyone else was in the apartment at the time of the sweep. *Contrast United States v. Schaper*, 903 F.2d 891, 894-95 (2d Cir. 1990) (security sweep reasonable where defendant's arrest in mid-afternoon on public street near his house "might be reported by onlookers to persons *known to be in the house*" (emphasis added)). The agents did not report seeing lights or hearing sounds to suggest the presence of another party. *See United States v. Segura*, 663 F.2d 411, 415 (2d Cir. 1981) (overruled on other grounds) (no reasonable belief that anyone was in apartment where law enforcement had kept apartment under surveillance for three hours and "had seen no lights, heard no sounds . . . and seen no person entering or leaving"). While of course there was the possibility that someone else was present, such a possibility is different from a reasonable likelihood. The Government has not met its burden in establishing exigent circumstances based on security concerns.

As for the potential destruction of evidence, the Government has not demonstrated that law enforcement had "a reasonable belief that there [were] persons inside the residence who might, *inter alia*, destroy evidence." *Schaper*, 903 F.2d at 894 (citations omitted). "[T]he existence of narcotics on the premises alone [does] not justify exigent circumstances, absent a showing that the drugs were in the process of being destroyed or removed from the jurisdiction." *Alexander*, 923 F. Supp. at 623 (citing *Vale v. Louisiana*, 399 U.S. 30 (1970)). "The immediacy of the threat of destruction of evidence is the key factor in assessing the exigency of the circumstances." *Id.* Here, law enforcement had no reason to conclude that the destruction of the contraband was imminent, *contrast United States v. Farra*, 725 F.2d 197, 198 (2d Cir. 1984) (urgent need justified warrantless entry where undercover agent knocked on hotel room door, identified himself, and subsequently heard "agitated conversation . . . augmented by the sounds of much stirring about and the slamming of drawers or doors"), and there was no evidence to suggest that anyone else was either inside the apartment or aware that Wolfe and Walker had been arrested. *Contrast United States v. Diaz*, 577 F.2d 821, 823-24 (2d Cir. 1978) (officers not required to leave scene of arrest immediately when defendant's roommate was present and risk existed that she would remove or destroy evidence). Moreover, given that the apartment was

8

under continuous surveillance by law enforcement and any attempt by a third party to enter the premises would have been easily detected, the scene inside was frozen and unlikely to change during the time it took to apply for a search warrant. Therefore, the Government has also not met its burden of showing that loss of evidence concerns justified the sweep.

### C. Search Warrant

Wolfe argues that if the security sweep was unlawful, then the search warrant was invalid because it was obtained, in part, based upon plain view evidence observed during the sweep. The Government contends that the search warrant was valid because even if the security sweep was improper, the search warrant affidavit did not rely heavily on the observations made during the sweep and the warrant would have been issued regardless.

The court agrees that the search warrant was valid and would have been issued even without reference to the plain view evidence. The "inevitable discovery" exception to the exclusionary rule "allows evidence initially detected as the result of unlawful government conduct to be introduced nonetheless '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *United States v. Whitehorn*, 829 F.2d 1225, 1230 (2d Cir. 1987) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "For inevitable discovery to be demonstrable, it must be the case that the evidence would have been acquired lawfully through an independent source absent the government misconduct. *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) (citation omitted). "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Id.* at 861 (emphasis in original). "[I]t is well settled that [t]he ultimate inquiry . . . is not whether the underlying [search warrant] affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause." *Whitehorn*, 829 F.2d at 1231 (internal quotation marks and citation omitted).

Only one paragraph in Agent Hope's search warrant affidavit relied upon observations made during the sweep. Excluding this one paragraph, the remainder of the affidavit makes clear that a lawful search of the apartment was both inevitable and appropriate. "[P]robable cause to

9

search is demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *See United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks and citation omitted). Here, the affidavit recited ample facts to establish probable cause that an armed drug deal had taken place in the apartment and that a drug ring was using the apartment as a base. That information from the sweep made its way into Agent Hope's affidavit does not invalidate the entire warrant or the subsequent search of the apartment. *See Whitehorn*, 829 F.2d at 1231 ("[w]here a court can conclude from the search warrant affidavit that probable cause for the search existed, without reference to the tainted information, the search remains valid"). As the warrant would have been validly issued even without the observations made during the security sweep and all of the same evidence would have inevitably been found, the obtained evidence should not be suppressed.

### III.   Conclusion

For the reasons stated above, Wolfe's Motion to Suppress Physical Evidence and Statements (Doc. 38) is DENIED.

Dated at Rutland, in the District of Vermont, this 15th day of December, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court